IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

NORMA J. ROBERTS          )
                                   )
v.                             )       No. 3:08-0531
                                   )       Judge Wiseman/Bryant
SOCIAL SECURITY ADMINISTRATION   )

To:    The Honorable Thomas A. Wiseman, Jr., Senior Judge


## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to obtain

judicial review of the final decision of the Social Security Administration ("SSA" or "the

Administration"), through its Commissioner, denying plaintiff's applications for disability

insurance benefits ("DIB") and supplemental security income ("SSI"), as provided under

Titles II and XVI of the Social Security Act ("the Act").  The case is currently pending on

plaintiff's motion for judgment on the administrative record (Docket Entry No. 15), to which

defendant has responded with its own motion for judgment (Docket Entry Nos. 21, 22).[1]

Plaintiff has further filed a reply brief in support of her motion (Docket Entry No. 23).  Upon

consideration of these papers and the transcript of the administrative record (Docket Entry

No. 13),[2]  and for the reasons given below, the undersigned recommends that plaintiff's

---

[1]For purposes of future filings, defendant is reminded that the undersigned's scheduling order
in these cases (Docket Entry No. 14) directs the filing of *a brief in response* to plaintiff's motion, not
the government's own cross-motion for judgment.

[2]Referenced hereinafter by page number(s) following the abbreviation "Tr."

1

motion be GRANTED, that defendant's motion be DENIED, and that the decision of the SSA be REVERSED and the cause REMANDED for further administrative proceedings, to include rehearing.

## I. Procedural History

Plaintiff filed her DIB and SSI applications on July 23, 2004, alleging disability since November 15, 2003 (Tr. 48-50). Following denials of these applications at the initial and reconsideration stages of state agency review (Tr. 38-41, 43-46), plaintiff requested a *de novo* hearing before an Administrative Law Judge ("ALJ"). That hearing was held on March 14, 2007, before ALJ Linda Gail Roberts, who received testimony from plaintiff and an impartial vocational expert (Tr. 720-49). Plaintiff was represented by her current counsel at the hearing. The ALJ took the case under advisement at the conclusion of the hearing, until May 17, 2007, when she issued a written decision denying plaintiff's claims (Tr. 14-24). The decision contains the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2. The claimant has not engaged in substantial gainful activity since November 15, 2003, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. The claimant has the following severe impairments: chronic foot pain, diabetes mellitus, lower back pain, obesity, schizoaffective disorder, and borderline personality disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

2

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift 20 pounds occasionally, stand or sit at least 6 hours in an 8-hour workday, she can understand and remember simple and detailed tasks and can concentrate and attend to the same tasks despite some difficulty, she can interact with co-workers and supervisors without significant limitations, she can relate with the general public despite some difficulty, and she can adapt to work-like settings and changes with some, but not substantial, difficulty.

6.    The claimant is capable of performing past relevant work as a personal and home care aid[e], cashier and waitress. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from November 15, 2003 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 19, 20, 24)

On April 15, 2008, the SSA's Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 7-10), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. §§ 405(g), 1383(c). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id.

## II. Review of the Record

The following record review is taken in large measure from plaintiff's brief (Docket Entry No. 16 at 2-9).

### A. Personal Information

Plaintiff was born on April 17, 1958 (Tr. 48, 723) and was 48 years old at the time of

3

her hearing. She alleged disability beginning November 15, 2003, due to foot problems, asthma, kidney problems, and high blood pressure (Tr. 48, 101). Subsequently, plaintiff complained of swelling in her right leg and ankle, anemia, and diabetes (Tr. 72, 79, 90). Although plaintiff did not initially allege any mental impairment, she identified several sources from whom she had received, and was continuing to receive, ongoing mental health treatment (Tr. 73, 80, 82, 91, 103-104), and in response to the ALJ's question as to what caused her to become disabled on November 15, 2003, she replied, "I was having a lot of feet problems and going through mental problems." (Tr. 726). Plaintiff is insured for DIB through December 31, 2008, and possesses a 12th-grade education (Tr. 29, 52, 106, 723-724). During the vocationally relevant period, plaintiff worked as a personal in-home care aide, child care worker, cashier, and waitress (Tr. 53-57, 724-726, 741-743).

B. Severe Impairments and Treating Source Evidence

*Mental Impairments.* Plaintiff's mental health treatment with Mental Health Cooperative ("MHC") dates back to at least August 12, 1998, at which time her therapist reported she was experiencing increasing symptoms of depression and an obsessive-compulsive disorder (Tr. 617). Records reflect plaintiff received regular, ongoing treatment at MHC with diagnoses ranging from generalized anxiety disorder, dysthymia, major depressive disorder (sometimes with and sometimes without psychotic features), bipolar disorder, borderline personality disorder, post-traumatic stress disorder, to schizoaffective disorder (Tr. 480-617, 677-714). Her global assessment of function ("GAF") scores reported on the Clinically Related Group ("CRG") forms at MHC have ranged from 25 (on July 21, 1998) to 60 (on October 8, 1999) (Tr. 677). Since her alleged disability onset date (November 15, 2003), plaintiff's GAF scores have ranged between 45 and 50. Id. During that same period,

4

the CRG forms from MHC reflect plaintiff's assessed degree of limitation to be either "marked" or "extreme" in all domains of psychological functioning except the domains of "Activities of Daily Living" and "Concentration, Task Performance, and Pace," which were assessed as either markedly or moderately limited. (Tr. 489-90, 678-79, 681-82)

On one occasion, following a hospitalization to perform a cystoscopy to alleviate chronic pelvic pain, plaintiff developed visual hallucinations, seeing spiders and snakes and stating they were biting her (Tr. 161). The anesthesia utilized for the procedure was suspected of causing these symptoms, but anesthesiologists concluded this did not contribute to the symptoms and plaintiff was transferred to an inpatient psychiatric facility (Tr. 162). Doctors there reported plaintiff was delusional and, in addition to seeing spiders, snakes, and ants, thought she was two years old (Tr. 165).[3] Her discharge diagnosis was psychotic disorder, not otherwise specified, and bipolar disorder with psychotic features, by history (Tr. 167).

*Bilateral Foot Impairment.* Plaintiff has experienced bilateral foot pain since at least March 1998, when she first consulted Frances Hawthorn, D.P.M., complaining of pain in her heels and arches (Tr. 209). Plaintiff's job at the time required her to stand all day, which she said caused a "great deal" of pain. Id. Among other findings, Dr. Hawthorn reported both

---

[3] This was not the first time plaintiff reported hallucinations. In September 2000, she described voices telling her to "jump in the pool." (Tr. 575). Other hallucinations include, but are not limited to: voices "tell[ing] me to do stuff" in November 2000 (Tr. 573); male and female voices telling her she "need[s] to go do this" in February 2001 (Tr. 569); voices "[telling] me the other night that I shot someone" in March 2001 (Tr. 565); and mumbling voices in April and May 2001 (Tr. 558, 562-63). There followed a relatively quiescent period before the hallucinations resumed in October 2004, following the death of her father (Tr. 509, 511, 513).

heels were swollen and tender, and he diagnosed plaintiff with bilateral plantar fasciitis. Id.
Plaintiff underwent left heel-spur surgery in October 1998 (Tr. 206). Plaintiff reported
ongoing bilateral foot pain through August 1999, at which time she discontinued treatment
with Dr. Hawthorn (Tr. 201-06, 209). Four years later, in September 2003, plaintiff returned
to Dr. Hawthorn complaining of burning, numbness, and pain on the plantar aspects of both
feet with all activity (Tr. 201). In the interim, plaintiff had undergone a total right knee
replacement. Id. Dr. Hawthorn reported both feet were tender to palpation and based on his
examination, as well as an EMG performed in 1999, he diagnosed plaintiff as suffering from
bilateral tarsal tunnel syndrome and bilateral Morton neuroma. Id. Dr. Hawthorn ordered
an updated EMG, which was performed by Shan-Ren Zhou, M.D., on October 2, 2003 (Tr.
109-12). Dr. Zhou's physical examination was notable for decreased pinprick sensation and
vibratory sensation in the lower extremities, as well as diminished reflexes in the ankles (Tr.
109). Dr. Zhou reported, "The patient has an absent bilateral plantar median nerve response,
so it is highly likely she has tarsal tunnel syndrome bilaterally." (Tr. 110). Dr. Hawthorn
discussed Dr. Zhou's findings with plaintiff and prescribed an increased dosage of Neurontin
(Tr. 200). When this proved ineffective in alleviating her pain, plaintiff told Dr. Hawthorn
"she was ready to do the surgery." Id. Dr. Hawthorn told plaintiff he could only do one foot
at a time and asked her which foot was worse, to which plaintiff responded "the left was
worse far and away." Id. Dr. Hawthorn performed a tarsal tunnel release on plaintiff's left
foot on November 21, 2003 (Tr. 113-14). By June 2004, seven months after the surgery,
plaintiff continued to report pain in her left foot, although she thought it was "better." (Tr.
196). Dr. Hawthorn reported plaintiff's foot was still swollen and tender to palpation. Id.
The next month, plaintiff reported she had sprained her *right* foot on July 9, 2004, and was

6

wearing a walker boot on her foot and ankle.  Id.  Dr. Hawthorn ordered an MRI, which was inconclusive but suggestive of a small partial tear of the posterior tibial tendon, and diagnosed plaintiff as suffering from posterior tibial tendonitis and tarsal tunnel syndrome of the right foot (Tr. 195).  In his final note of October 4, 2004, Dr. Hawthorn indicated that other than possibly tarsal tunnel surgery on the right foot, there was nothing else he could do for plaintiff.  Id.  Plaintiff later testified that she did not undergo a right tarsal tunnel release at the time due to losing her insurance and having no money to pay for the procedure (Tr. 727-28).

*Other Impairments.*  Plaintiff suffers from additional impairments including obesity, asthma, hypertension, diabetes, episodic fatigue, episodic anemia, and arthritis in her left ankle, all of which are documented in the voluminous notes from her primary care physician, John Stewart, M.D. (Tr. 257-403, 635-54).

### C.  Medical Evidence: Consultative Examinations

Albert Gomez, M.D., performed a consultative physical examination of plaintiff on November 17, 2004 (Tr. 210-14).  Dr. Gomez reported plaintiff wore a boot on her right lower leg and foot and had moderate difficulty getting on and off the exam table (Tr. 211).  Abnormal findings reported by Dr. Gomez included: moderate tenderness in the knees to palpation, moderate tenderness in the hip to palpation, mild tenderness to palpation in the ankles, mild tenderness to palpation in the back, decreased sensory innervation in both feet, inability to walk on her heels or squat, and difficulty walking on her toes (Tr. 212).  Based on his examination, Dr. Gomez opined plaintiff could occasionally lift 20 pounds and stand or sit at least 6 hours in an 8-hour workday (Tr. 214). He diagnosed plaintiff with chronic foot pain, diabetes, chronic low back pain, and obesity.  Id.

7

No consultative mental examinations were obtained.

D.  Medical Evidence: State Agency Evaluations

A nonexamining, nontreating state agency consultant opined plaintiff could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk about 6 hours per 8-hour day, and sit about 6 hours per 8-hour day (Tr. 231); was limited to frequent postural activities (Tr. 232); and should avoid concentrated exposure to irritating inhalants (Tr. 234).

Two nonexamining, nontreating state agency consultants opined plaintiff had no more than moderate limitations as a result of her mental impairments (Tr. 238-55, 618-34).

E.  Plaintiff's Testimony

Plaintiff testified she was born April 17, 1958, was 48 years old at the time of the hearing, and possessed a 12th-grade education (Tr. 723-24).  During the vocationally relevant period, she sat for the elderly, worked in a daycare, and worked as a cashier and waitress (Tr. 724-26). She stated she applied for Social Security disability because she "was having a lot of feet problems and going through mental problems."  (Tr. 726).  She denied working since her alleged disability onset date of November 15, 2003.  Id.

Plaintiff testified both feet burned and swelled when she stood, to the point she would have to get off her feet to get relief (Tr. 728).[4]  She stated she had returned to work

_____

[4]Plaintiff's testimony was confusing, at best, concerning her ability to stand and/or walk.  At one point, she said she could be on her feet for an hour and a half (Tr. 733); at another, 25 minutes (Tr. 737); at another, less than 10 minutes, or a round-trip to her mailbox (Tr. 738); and at yet another, about 30 minutes (Tr. 740). Counsel asked plaintiff how long it had been since she was on her feet for 90 minutes, to which she replied, "It's at work, when I quit work." (Tr. 739). In a Fatigue Questionnaire completed on April 4, 2005, plaintiff reported she "[could] be on my feet for about 15 to 20 minutes." (Tr. 89)

8

after her knee replacement in 2001 and heel spur surgery before than.  Id.  Plaintiff reported

that in the past, her asthma sometimes required the use of a home nebulizer, but now she

could get by with inhalers (Tr. 729-30, 734).  She said her diabetes was under relatively good

control, but that her anemia caused her to feel tired and jittery (Tr. 730).

Plaintiff testified four of her close family members died in the last few years and that

she had been receiving mental health treatment for depression and anxiety since 1998 (Tr.

731-32).  She said these problems left her with no energy or desire to do anything (Tr. 732).

She stated she took a lot of medication for her problems, some of which had side effects.  Id..

Plaintiff reported her doctor had told her to elevate her legs when sitting to reduce fluid and

swelling (Tr. 733).  She said her feet swelled when she sat with her feet on the floor.  Id.  She

reported difficulty with both standing and walking (Tr. 734).  Plaintiff also complained of

bladder problems, stating she had to go the restroom five to six times during an average two

hour period (Tr. 735).  She said if she could not go immediately, she usually wet herself . Id.

When asked what caused her the most problems, plaintiff testified, "[t]he mental and the

feet." (Tr. 736)

### III.  Conclusions of Law

#### A.  Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's

findings of fact are supported by substantial evidence in the record and whether the correct

legal standards were applied.  Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125

(6th Cir. 2003).  "Substantial evidence is defined as 'more than a scintilla of evidence but less

9

than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached.  Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999).

## B.  Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  Id. at § 423(d)(3).  In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

> 2) A claimant who does not have a severe impairment will not be found to be disabled.

> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed

10

impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

4) A claimant who can perform work that he has done in the past will not be found to be disabled.

5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis

11

required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

## C. Plaintiff's Statement of Errors

*Mental Limitations.* Plaintiff first argues that the ALJ erroneously rejected the opinions of her treating sources at the Mental Health Cooperative ("MHC"), in favor of the May 2005 opinion of the nonexamining consultant, Dr. George T. Davis, Ph.D. (Tr. 618-34) Specifically, plaintiff argues that the regulations, 20 C.F.R. §§ 404.1527 and 416.927,[5] require deference to the MHC clinicians' assessments of her functioning within the domains provided in the several Tennessee Clinically Related Group ("CRG") assessment forms, including their assignment of scores on the Global Assessment of Functioning ("GAF") scale. However, as alluded to in defendant's response brief, and as further explained below, the cited regulations do not direct the outcome with regard to these MHC assessments, as it is entirely unclear whether any of the MHC employees who completed the CRG forms was even an acceptable (or unacceptable, for that matter) medical source, as defined in the

---

[5]The language of these sections is identical; hereinafter, only § 404.1527 will be cited. These regulations establish the general preference for examining source opinions over the opinions of nonexamining sources, and among examining sources, for those who have a treatment relationship with the claimant over those who do not. 20 C.F.R. § 404.1527(d)(1)-(2). Furthermore, the regulations generally require that more weight be given the opinion of a specialist about issues within his or her specialty than to the opinion of a generalist. 20 C.F.R. § 404.1527(d)(5). Also to be weighed in the analysis are the extent to which the medical opinion is supported by relevant evidence including medical signs and laboratory findings; its consistency with the record as a whole; and, any other factors which might tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(3)-(4), (6).

Case 3:08-cv-00531   Document 24   Filed 04/20/09   Page 12 of 21 PageID #: 97

regulations.  It **is** clear that they were not treating medical sources for purposes of § 404.1527 or Social Security Ruling 96-2p, despite plaintiff's argument to the contrary.  Therefore, the ALJ was not strictly bound to evaluate the opinions contained in those CRG forms, including the GAF assessments, within the parameters established in the foregoing regulations.

The parties argue over whether the Sixth Circuit recognizes a GAF score as a "medical opinion," but would presumably agree that any score to be so recognized would need to have been assigned by a medical source.  In the very regulation upon which plaintiff's argument is based, "medical opinions" are defined as "statements from physicians and psychologists or other acceptable medical sources" which reflect judgments about the nature and severity of an impairment and any resulting limitations.  20 C.F.R. § 404.1527(a)(2).  Likewise, in order for an opinion to trigger the protections of the so-called "treating physician rule" described in § 404.1527(d)(2),[6] that opinion must first be "well-supported by medically acceptable clinical and laboratory diagnostic techniques...."  Opinion evidence from medical

_____

[6]This subsection accords the following evidentiary and procedural favor to the medical opinion of a treating source:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed [below] in determining the weight to give the opinion.  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

13

professionals who are not "acceptable medical sources," or such evidence from professionals outside of the healthcare industry, must be considered along with all other relevant evidence in the record, 20 C.F.R. §§ 404.1513(d), 404.1527(c), but the protections of the treating physician rule do not apply to a source who is not a licensed physician, psychologist, or other acceptable medical source.  See 20 C.F.R. § 404.1502; Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 530 (6th Cir. 1997).

In this case, plaintiff was treated at MHC by medical doctors including Dr. Peggy Marion and Dr. Angela Alesi.  However, the CRG assessment forms upon which plaintiff relies were not completed by these psychiatrists, but were completed by six "raters" who do not appear to have any higher qualification than that of "case manager."  Indeed, the record shows that only three of  the six raters -- Chris Sarver, Linda All, and Rosetta Howard -- are mentioned in the extensive MHC records as involved in plaintiff's care, all as case managers who are presumably not also licensed psychologists or psychiatrists.  (Tr. 684-86, 688-92, 697, 699, 703, 706-08, 710, 712)  Of these three, Chris Sarver's involvement with plaintiff is documented as enduring the longest, with eight home visits in fourteen months (Tr. 697-712).  Linda All visited plaintiff on eight occasions in less than four months (Tr. 684-92). Rosetta Howard's lone documented visit with plaintiff produced the notation that plaintiff had voiced her "discontent over being passed around between case managers."  (Tr. 695) Given the status of these raters as nonmedical, "other sources" under the regulations, 20 C.F.R. § 404.1513(d)(3), as well as the circumstances establishing their relative unfamiliarity with plaintiff's enduring level of impairment, the undersigned finds that the ALJ did not run afoul of § 404.1527 or Social Security Ruling 96-2p in failing to defer to their CRG

assessments of plaintiff's functional abilities.

However, the SSA has recently recognized that, because it is required to consider all available evidence in deciding a benefits claim, and because § 404.1527 does not explicitly address the way in which "other source" opinion evidence is to be evaluated, its policy governing the evaluation of such evidence was in need of clarification. Thus, Social Security Ruling ("SSR") 06-03p was promulgated. 2006 WL 2329939 (S.S.A. Aug. 9, 2006). The gist of this ruling is that it is generally appropriate to weigh opinion evidence from "other sources," both medical and nonmedical, by loosely applying the factors identified in § 404.1527(d). For instance, when the opinion being evaluated is from a nonmedical professional such as the case managers discussed here, "it would be appropriate to consider such factors as the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the opinion." 2006 WL 2329939, at *5.

Of greater significance here, the ruling addresses the responsibility of ALJs to explain their consideration of opinions from "other sources," as follows:

> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent

15

> reviewer to follow the adjudicator's reasoning, when such opinions may have
> an effect on the outcome of the case.

Id. at *6.  While the ALJ in this case cited SSR 06-03p in her narrative decision (Tr. 20), there

is no discussion anywhere in that decision of the CRG assessments rendered by plaintiff's

case managers and others at MHC.  Indeed, the ALJ's discussion of the MHC records is

focused almost exclusively on the extent to which those records reflect plaintiff's positive

response to treatment and medications (Tr. 23).  Conversely, the CRG assessments paint a

picture of an individual disabled by her mental impairments, yet the court is left to guess

whether the ALJ considered those assessments at all.  Accordingly, while the mandate of §

404.1527 does not technically apply to the opinions expressed in the CRG assessment forms,

the absence of any indication in the ALJ's decision that such forms were considered and

rejected amounts to reversible error.  Butterman v. Astrue, 2009 WL 530121, at *6 (S.D. Ohio

Feb. 27, 2009).  Reversal and remand is therefore appropriate to allow explicit consideration

of the CRG assessments, as well as reconsideration of the mental demands of plaintiff's past

relevant work[7] in light of whatever changes are made in plaintiff's mental RFC, if any.


   *Physical Limitations.*  Regarding the ALJ's determination of her physical limitations,

plaintiff first argues that the ALJ erred in failing to make findings with regard to her

---

   [7]Plaintiff argues that the ALJ did not sufficiently inquire into the mental demands of
plaintiff's past relevant work, citing SSR 82-62.  However, this argument appears to be based on the
limitations assessed in the CRG forms, and the extent to which those limitations are inadequately
accounted for by the ALJ's finding that plaintiff's past jobs were not more mentally demanding than
semi-skilled work is generally understood to be.  Therefore, the undersigned believes that
reconsideration of the mental demands of plaintiff's past jobs would be required if, and only if, the
CRG assessments or any part of them are adopted by the ALJ upon remand.

16

exertional ability to engage in frequent lifting or carrying, or to walk, push, and pull, in contravention of the requirements of SSR 96-8p. She further argues that the finding of her ability to stand for six out of eight hours with normal breaks, based on the assessment of consultative examiner Dr. Gomez, is at odds with that examiner's findings of plaintiff's moderate knee tenderness, decreased sensory innervation in both feet, inability to squat or to walk on her heels, and difficulty with walking on her toes (Tr. 212). Addressing this latter contention first, it is clear that neither Dr. Gomez nor the ALJ viewed the aforementioned findings as inconsistent with the ability to stand; rather, both found significant the fact that plaintiff had no tenderness to palpation of the feet. (Tr. 22, 212) The ALJ further noted that, despite the medical evidence showing plaintiff's history of significant problems with her feet (Tr. 21, 195-209) and her testimony to the same, "she has not received any regular medical treatment for her foot problems since August 2004, over 2 ½ years ago[,]" but "has been capable of performing a wide range of daily and other activities." (Tr. 22) The record does show that plaintiff complained to Dr. Stewart of her left foot being no better on July 26, 2004, but was reportedly content to continue seeing her podiatrist, Dr. Hawthorn (Tr. 292-94). Two months later, plaintiff was told at her last visit with Dr. Hawthorn that there was nothing else to do but treat her pain complaints with medication, "except [she could] possibly do a [right] tarsal tunnel surgery if warranted." (Tr. 195) Plaintiff's extensive history of treatment with her primary care physician, Dr. Stewart, since that time does not reflect any particular complaints of foot symptoms, as noted by the ALJ. (Tr. 257-91, 635-54) Moreover, the conclusion of Dr. Gomez with respect to plaintiff's chronic foot pain and its impact on her ability to stand is not opposed by any treating source opinion on the issue. Therefore, the undersigned finds that substantial evidence on the record as a whole supports

the ALJ's adoption of Dr. Gomez's assessment.

With regard to the function-by-function analysis required by SSR 96-8p, the agency has given the following interpretive guidance:

> The RFC assessment must address both the remaining exertional and nonexertional capacities of the individual.
>
>              ...
>
> Exertional capacity addresses an individual's limitations and restrictions of physical strength and defines the individual's remaining abilities to perform each of seven strength demands: Sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function must be considered separately (e.g., "the individual can walk for 5 out of 8 hours and stand for 6 out of 8 hours"), even if the final RFC assessment will combine activities (e.g., "walk/stand, lift/carry, push/pull")....
>
> It is especially important that adjudicators consider the capacities separately when deciding whether an individual can do past relevant work....

1996 WL 374184, at *5. The Sixth Circuit, in the unpublished decision of Delgado v. Comm'r of Soc. Sec., 30 Fed.Appx. 542 (6th Cir. Mar. 4, 2002), has adopted the reasoning of the Third Circuit in Bencivengo v. Comm'r of Soc. Sec., 251 F.3d 153 (3d Cir. Dec. 19, 2000), to the effect that the separate consideration of each function required by SSR 96-8p does not necessarily translate into a requirement that each function be discussed in the ALJ's decision, since "[t]he ALJ need not decide or discuss uncontested issues, 'the ALJ need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record.'" Delgado, 30 Fed.Appx. at 547-48 (quoting Bencivengo, supra, slip op. at 5)).

18

In this case there is a dispute, and certainly a healthy amount of inconsistency, with regard to plaintiff's ability to stand *and walk*. See Docket Entry No. 16 at 8 n.3. It would seem that two of the three past relevant jobs to which plaintiff was found capable of returning -- personal/home care aide and waitress -- would require significant walking in addition to standing. The undersigned finds that this function, at least, deserved some explicit attention in the ALJ's decision pursuant to SSR 96-8p, as well as in the ALJ's positing of hypothetical limitations to the vocational expert. Accordingly, the ALJ's evaluation of plaintiff's exertional RFC lacks substantial evidentiary support as written, undermining her finding of plaintiff's physical ability to return to her past relevant work. Reversal and remand is therefore appropriate so that the ALJ may reconsider plaintiff's exertional RFC, in addition to reconsidering the evidence of plaintiff's mental limitations discussed infra.

*Credibility.* Finally, with regard to plaintiff's argument that the ALJ made her credibility finding without identifying any specific reasons for that finding, the undersigned would submit that the ALJ clearly identified her reasons for disbelieving plaintiff's complaints of disabling foot pain and otherwise impaired functional ability, as follows:

> Treatment notes from Stewart Family Health show that she was treated on a regular basis from 2003 to 2006 for a myriad of medical problems, including diabetes mellitus, lower back pain, and mental problems, but she was not treated for her alleged foot problems. In fact, she rarely mentioned having any problems with her feet. Surely if her foot pain were as severe as she claims she would have sought some type of treatment for the problem....

> The undersigned further notes that despite her multiple medical conditions, the claimant has been capable of performing a wide range of daily and other activities.

19

In a questionnaire dated April 2005 the claimant admitted that she grocery shopped once per week, washed dishes, did the laundry, ironed, cooked breakfast and an evening meal, did the household cleaning, and took care of her parents. Treatment notes from the mental health clinic also show that the claimant continues to perform a wide range of activities. One treatment note indicated that she was taking care of her mother on a daily basis. Another treatment note indicated that she and her mother were "very" active in the church and yet another treatment [note] indicated that the claimant cleaned a house to earn money for Christmas. Given all of the above, the claimant should have no problems performing her daily and other activities within the residual functional capacity set out above.

(Tr. 22-23)(internal citations omitted)

Respectfully, the undersigned must find that the requirement of SSR 96-7p -- that the ALJ's credibility determination be explained by reference to "specific reasons ... supported by the evidence in the case record," 1996 WL 374186, at *4 -- has plainly been satisfied in this case.

## IV.  Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be GRANTED, that defendant's motion for judgment on the administrative record be DENIED, and that the decision of the SSA be REVERSED and the cause REMANDED for further administrative proceedings consistent with this report, to include rehearing.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any

responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Cowherd v. Million</u>, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 20th day of April, 2009.


 s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE

21